**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CASE NO. 1:23-mj-00150-GMH** |
| | : | |
| **TAYLOR FRANKLIN TARANTO,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its motion that the defendant be detained pending trial pursuant to 18 U.S.C. § 3142 (f)(2)(A) (Serious Risk of Flight).[1] The government requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination regarding pretrial detention.

**PROCEDURAL HISTORY**

At the initial appearance on June 30, 2023, the government orally moved for detention pending trial pursuant to 18 U.S.C. §§ 3142(f)(2)(A) (Serious Risk of Flight).  The defendant objected to the hearing on that basis.  The Court overruled the objection and granted the government's request for a detention hearing.

**FACTUAL HISTORY**

On June 28, 2023, the defendant, Taylor Franklin Taranto, began live streaming on a publicly available YouTube channel.  During the stream, he was in his van, a 2000 black Chevrolet Express G1500, and stated he was in Gaithersburg, Maryland, headed to the National Institute of

---

[1] An alternative ground for detention is available under 18 U.S.C. §§ 3142(e)(2)(A) and (f)(1)(E) based on the defendant's unlawful possession of firearms which is detailed below.

1

Standards and Technology ("NIST").  He made several statements indicating that he intended to blow up his vehicle at NIST, including a statement that he had a detonator, that he was on a "one way mission," and that the vehicle was self-driving so he would not have to be anywhere near it when it "went off."[2]

The Federal Bureau of Investigation ("FBI") had been monitoring Taranto's online activities due to his participation in the January 6, 2021, siege on the United States Capitol.  They immediately began searching for Taranto and alerted other law enforcement partners.

On June 29, 2023, the United States District Court for the District of Columbia issued an arrest warrant based on a complaint charging Taranto with multiple crimes related to his participation in the January 6 riots.  Later that same day, Taranto again began to livestream.  He was again in his van, this time driving in a residential area of Washington D.C.  During the video, Taranto stated he was traveling on "Belmont Road" which is in the Kalorama neighborhood.

Eventually Taranto exited from the van and began walking through the neighborhood as he continued to stream.  While walking, he made several concerning statements regarding the residences in the area, saying that he was looking for "entrance points," that he had "control" of the block and "had them surrounded" and that he was going to find a way to the "tunnels underneath their houses."  He also repeatedly stated that he was trying to get a "shot" and that he wanted to get a "good angle on a shot."  The neighborhood where Taranto was located is a restricted area monitored by the United States Secret Service.   While walking, Taranto encountered, and attempted to evade, Secret Service special agents who were attempting to

---

[2] Notably, NIST has a nuclear reactor on its property. *See* https://www.nist.gov/news-events/news/2023/03/nrc-authorizes-restart-nist-research-reactor#:~:text=The%20NIST%20reactor%20is%20used,all%20times%20during%20the%20event

monitor and detain him.  Taranto was ultimately arrested after a short foot pursuit in a wooded area near Rock Creek Parkway.

Law enforcement located Taranto's van a short distance away.  Based on the nature of Taranto's earlier threats, the FBI's bomb squad and Metropolitan Police K9 Officers were deployed to the vehicle.  One of the K9's alerted on the van for the presence of gunpowder.  A search of the vehicle revealed hundreds of rounds of nine-millimeter ammunition and two firearms inside.

### I.  Capitol Siege - January 6, 2021

On January 6, 2021, Taranto attended a rally in Washington D.C. near the Washington Monument shortly before travelling to the Capitol grounds and unlawfully entering the building.  At approximately 2:33 p.m., the Upper West Terrace doors were breached by rioters.  By approximately 2:38 p.m., Taranto joined a mob of people streaming into the Capitol.  Video shows that Taranto entered the building wearing a dark jacket and baseball cap and carrying a black cane with a pointed handle.



Figure 1 Depicts Taranto's Appearance on January 6, 2021

He moved through various areas of the building and ultimately arrived at the entrance to the Speaker's Lobby around 2:42 p.m.  Around this time, a rioter attempted to jump through a glass window and was shot by a United States Capitol Police Officer.  In the wake of the shooting, multiple members of law enforcement arrived and began moving the crowd, including Taranto, toward the exits.  Several members of the crowd were aggressively yelling, pushing, and refusing to follow officers' directions to leave.  Next to the exit, Taranto and multiple other rioters, including a male identified as David Walls-Kaufman (who has been convicted and sentenced for his conduct on January 6, 2021), scuffled with police officers.  Taranto left the building at

approximately 2:56 p.m., but remained on the Capitol grounds, moving to the East side of the building where he gathered with other rioters.  There, Taranto listened to speeches and also fought with other rioters, using a cane to fend them off.

Since January 6, 2021, Taranto has continued to post statements about his involvement at the Capitol that day.  For example, on July 15, 2021, Taranto posted a Facebook video of himself, in the Capitol on January 6, in which he states, "So we're in the Capitol building….legislative building…we just stormed it."  The video is accompanied by a caption which states, "This is me 'stormin' the capitol' lol I'm only sharing this so someone will report me to the feds and we can get this party rolling!"



Figure 2

On February 20, 2023, he posted a YouTube link to what appears to be same video, this time accompanied by the captions, "Still waiting for this show to get on the road…Where's Merrick?" and "Look, Mom! I'm an insurrectionist now and on TV!"

5



Figure 3

On June 17, 2023, a video interview of Taranto was posted online.  The video is titled "Exclusive Taylor Taranto talks about being on scene when Ashli Babbitt got shot."  Taranto was interviewed on camera for approximately two hours.



Figure 4

During the interview, Taranto discussed being inside the Capitol on January 6 and reviewed video footage of himself from that day and narrated what he was doing and what was happening

around him in the footage.  The interview host and Taranto spent a considerable amount of time dissecting footage of Ashli Babbitt being shot, and Taranto endorsed a conspiracy theory that Babbitt's death was a hoax and that the first responders and people in the crowd around her were actors.

## II.    Civil Lawsuit

Shortly after January 6, 2021, the widow of former United States Capitol Police Officer Jeffrey Smith sued Taranto and co-defendant David Walls-Kaufman in United States District Court.  Taranto, proceeding *pro se* in the case, has filed multiple documents acknowledging his presence in the Capitol that day.

## III.    Social Media Accounts

At various times since January 6, Taranto has utilized and posted to multiple types of media and social media, many of which, until recently, were open for public viewing and easily accessible.  These accounts include(d) Facebook, YouTube, Truth Social, Parler, and Telegram.

Taranto uses theses platforms to express his thoughts on a wide-ranging number of topics, most of which are focused on January 6, a belief that the 2020 election was fraudulent, and an endorsement of theories that "QAnon" followers promote.  Taranto's Facebook account includes the following biographical information and states in no uncertain terms that Taranto does not recognize governmental authority:



Figure 5

Since Taranto's arrest, this account has significantly trimmed its online content.  It is not clear if the content has been deleted all together, or if the account has simply changed its privacy settings.  A large amount of content that was previously open is no longer generally available.

Taranto routinely streamed from his public YouTube channel.   Law enforcement monitored this channel, especially over the last week, as he made multiple threats against NIST, *see, e.g., above* at p. 2, and against other individuals.  It is also the account that Taranto was live-streaming from during his arrest by United States Secret Service.    Since Taranto's arrest, this account appears to have been deleted.  The content is no longer publicly available.  It is not known at this time who deleted/altered these accounts, as Taranto has been in custody, with no access to the necessary technology since his arrest.

### IV.    Presence in Washington D.C., Threats, and Weapons - June 2023

The FBI has been actively investigating Taranto since shortly after he was identified as a participant in the January 6 riots in 2021. Until recently, investigators believed that Taranto lived in the City of Pasco in the State of Washington.    Based on open-source social media posts and videos, it appears that Taranto has travelled to Washington D.C. intermittently since January 2021. Approximately two months ago, however, Taranto moved cross-country, in his van, which is registered in his name. Taranto claimed to be living in his van in videos posted to social media. A search of the van, which is now in the custody of law enforcement, revealed a mattress and toiletries. The government does not believe that Taranto has a fixed address in the Washington, D.C. area.

According to Taranto's wife, he came to D.C. in response to Speaker of the House Kevin McCarthy's offer to produce January 6 video.  Since that time, Taranto has consistently appeared at so-called Freedom Corner[3], "protested" at various other locations, spoken and been interviewed about his participation on January 6, and consistently live streamed and posted videos espousing numerous conspiracy theories.   Below is a summary, but by no means an exhaustive list, of Taranto's most relevant and recent activities.   Several of Taranto's videos are filmed from the inside of his van.

### June 2023 – "Freedom Corner"

Since coming to Washington D.C., Taranto has been a regular fixture at "Freedom Corner." According to those that routinely gather there, Taranto has been banned from the area due to his offensive conduct toward other protestors.  It has also been reported that he was displaying erratic

---

[3] "Freedom Corner" refers to a location near the D.C. Jail where supporters of Capitol riot defendants gather.

and incoherent behavior.[4]

### June 14, 2023 – David Walls-Kaufman's Sentencing

Taranto's codefendant in the civil suit, David Walls-Kaufman, was also criminally prosecuted for his actions on January 6.  On June 13, 2023, Walls-Kaufman was sentenced in United States District Court in the District of Columbia.  Taranto attended the sentencing.  During the proceeding, Taranto was using an electronic device and was identified by United States Marshals.

### June 18, 2023 – Elementary School and Threats Against Congressman Raskin

On Sunday, June 18, 2023, Taranto used his YouTube channel to livestream himself and several other people at an elementary school in Takoma Park, Maryland.  The video, entitled "Piney Branch Elementary School J6th presentation (NOT for kids!)" which is several hours long, depicted Taranto and his associates walking around the school, entering the gymnasium, and using a projector to display a film related to January 6.

In a livestream, where Taranto answered questions from his internet audience, he stated that he specifically chose the elementary school due to its proximity to Congressman Raskin's home and that he is targeting Raskin because "he's one of the guys that hates January 6 people, or more like Trump supporters, and it's kind of like sending a shockwave through him because I did nothing wrong and he's probably freaking out and saying shit like, "Well he's stalking me." Taranto further comments, "I didn't tell anyone where he lives 'cause I want him all to myself," and "That was Piney Branch Elementary School in Maryland…right next to where Rep. Raskin and his wife live."

---

[4] *See* "Man arrested with guns near Obama's house had been acting erratically." Washington Post, June 30, 2023.  https://www.washingtonpost.com/dc-md-va/2023/06/30/obama-house-arrest-taranto-jan6/

**June 27, 2023 – Call to Speaker McCarthy's Office**

On June 27, 2023, Taranto's YouTube channel posted a video of Taranto playing an audio recording on his phone.   In the recording, Taranto, purportedly on the phone with Speaker McCarthy's office, repeatedly asks to be granted access to video footage from January 6, 2021.

**June 28, 2023 – YouTube Threats Against NIST, Speaker McCarthy**

On June 28, 2023, Taranto began livestreaming on his YouTube channel.  The stream began by showing Taranto's face, but quickly panned to show that he was sitting in his parked van.  Taranto stated that his van was parked in Gaithersburg, Maryland, and indicated that people were working on the vehicle.  During the video, Taranto made various statements that the van was "self-driving."  Notably, Taranto stated that he was "just going one way for this mission, to hell," and though he had a "detonator" he did not "really need one for this."  Taranto stated that the van would only have to go straight and described that he will be able to keep it straight on the road using a steering wheel lock.  He stated that he will not be near it when the van "goes off."[5]

During the video, Taranto also made ominous comments referencing Speaker McCarthy, saying, "Coming at you McCarthy.  Can't stop what's coming.  Nothing can stop what's coming."

Prior to June 28, 2023, law enforcement was searching for Taranto, but his lack of a fixed address frustrated efforts to find him.  Upon seeing his threatening comments, law enforcement escalated efforts to locate Taranto and increased resources to assist in the search.  However, efforts to locate Taranto that day were unsuccessful.

---

[5] Investigators recovered a steering wheel lock during its search of Taranto's van.

**June 29, 2023 – YouTube and Telegram Threats Against Former President Obama and John Podesta**

On June 29, 2023, Former President Donald Trump posted what he claimed was the address of Former President Barack Obama on the social media platform Truth Social. Taranto used his own Truth Social account to re-post the address. On Telegram, Taranto then stated, "We got these losers surrounded! See you in hell, Podesta's and Obama's."

Shortly thereafter, Taranto again began livestreaming from his van on his YouTube channel. This time, Taranto was driving through the Kalorama neighborhood of Washington D.C. The neighborhood contains restricted areas which are protected heavily by the United States Secret Service. Taranto parked his van on the street and began walking around the neighborhood, continuing to film. Taranto made several references to "the Podestas" and stated several times that he is trying to get an interview. Taranto's continued narration made it clear that he intended to access or enter the private residences of his subjects. For example, Taranto panned the camera to show several sewer grates on the street – calling them "entrance points," and stating that the grates were an "entrance" to reach "them." Throughout the video he also stated,

> "So if you go down there, there's obviously tunnels down there. I don't know how close they'll get you in terms of access;"

> "We're gonna find a way to the tunnels, underneath their houses;" and,

> "We're looking for tunnel access so we can get the interview, in case they try to weasel their way out. No in or out now! See, First Amendment, just say First Amendment, free speech. Free, it's free."

Throughout the video, Taranto repeatedly attempted to couch his actions in terms of "First Amendment" or free speech, as if he believes that simply saying the words, "First Amendment" absolved him from any trespass. When initially approached by Secret Service, Taranto stated,

"Hello, just trying to get an angle, for First Amendment, free speech. Thanks. That's Secret Service, she's alright." He also said, "See how it works? Just say, "First Amendment."

Taranto made additional concerning statements during the video including the following statements about getting a "shot":

> "Gotta get the shot, stop at nothing to get the shot. This is where other people come to get the shot;"

> "We're gonna see what we can get, as a shot. If I were them, I'd be watching this, watching my every move;" and,

> "This is where everyone goes to get the shot. It's just me today though. This is an easy way around. Yeah, they can't stop me from walking through here. Just don't step foot on the street."

Regarding getting an "angle," Taranto states several times, "Let's see what angles we can get," and, "Just trying to get an angle, for First Amendment, free speech." Additional concerning statements included:

> "I don't have any ID, so in case I get detained or something, they're just going to have to use their cellphone to figure out who I am."

> "So yeah, more than likely, these guys also all hang for treason. See how I said that? You gotta be very safe and careful. Someone warned me."

> "I control the block, we've got 'em surrounded"

> "Oh, is this intimidating? I don't think so."

Due to the restricted nature of the residential area where Taranto was walking, United States Secret Service uniformed officers began monitoring Taranto almost immediately as soon as he began walking around and filming. After observing Secret Service personnel, Taranto veered off the street, into a wooded area, and walked toward Rock Creek. As Secret Service agents approached Taranto, he began fleeing from them; however, Taranto was apprehended and placed under arrest.

**June 29-30, 2023 – Arrest and Search of Vehicle**

Following Taranto's arrest, officers quickly located Taranto's van where he had parked it on the street.  Because Taranto had previously indicated the vehicle contained some type of explosive device, the FBI's bomb squad technicians and MPD's K9 officers were deployed.  The K9 officers alerted on the vehicle, and a probable cause search was conducted.  Two firearms and hundreds of rounds of ammunition were located inside the van.



Figure 6 displays one of the firearms recovered from Taranto's vehicle.



Figure 7 displays the second firearm recovered from Taranto's vehicle.



Figure 8 displays the firearms and some of the ammunition and magazines taken from Taranto's vehicle.

Law enforcement records show that Taranto has 20 firearms registered to him. Two of those firearms, a Smith and Wesson M&P Shield, serial number LFK6710, and a Ceska 9mm CZ Scorpion E3, serial number C193454, were seized from Taranto's van. To date, the remaining 18 guns are at large; law enforcement has neither custody of those guns nor knowledge of their whereabouts.

On June 30, 2023, agents executed a search warrant for Taranto's vehicle and devices and seized two cellular phones pursuant to a warrant.[6] Inside the van, law enforcement found numerous items including the firearms mentioned above, hundreds of rounds of nine-millimeter ammunition, a steering wheel lock, and a machete. They also located indicia that Taranto was living in the van, including a mattress, clothing, and personal items. Evidence relevant to Taranto's participation in the January 6 breach of the Capitol was also recovered, including a hat identical to the one that USCP surveillance footage captured in a recording of Taranto's entrance into the Capitol building.

---

[6] On Friday, June 30, 2023, Magistrate Judge Harvey approved search warrant 23-SW-211which allowed the government to search Taranto's vehicle and electronic devices. The search is ongoing.

## LEGAL AUTHORITY AND ARGUMENT

**I.      The Bail Reform Act requires the Court to Analyze all Factors at a Detention Hearing.**

Under the Bail Reform Act, the government may seek detention and the Court must hold a detention hearing only when the charge is for certain enumerated crimes, 18 U.S.C. § 3142(f)(1), or when there is a serious risk that the defendant will flee or obstruct justice. *Id.* § 3142(f)(2). When the government makes a motion for detention, the analysis proceeds in two steps.  First, the judicial officer must undertake the threshold question of whether a detention hearing is appropriate.  *See United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999); *United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019).  For cases where the government requests detention based on flight, the Court must determine whether the "confluence of circumstances" is sufficient "to establish that [the] case presents a serious risk of flight justifying a detention hearing." *United States v. Sagastume-Galici*a, No. 19-287 (BAH), 2020 WL 2486423, at *2 (D.D.C. Apr. 22, 2020). "The decision whether to hold a hearing occurs based on even less information than a decision to detain or release: a detention order is based on a hearing, while an order to hold a hearing is based on a proffer of what the hearing might establish." *Singleton*, 182 F.3d at 12.

Here, the Court has already undertaken this analysis. At the initial appearance on June 30, 2023, the government moved for detention under 18 U.S.C. § 3142(f)(2) and informed the presiding Magistrate Judge that the basis for detention was risk of flight.  To support the risk of flight, the Government proffered that the defendant's home was not Washington D.C.; instead, Taranto had evidently been living out of his van in the area for the last two months.  The van has been seized by law enforcement and therefore, Taranto no longer has a place to live in this district,

and he has no ties here[7]  Based on this proffer, the Magistrate Judge set a detention hearing on July 5, 2023, concluding that the Government has met its burden to demonstrate a risk of flight to trigger the hearing under § 3142(f)(2).

## II.    The Basis for the Detention Hearing does Not Constrain the Court's Consideration of Factors Under § 3142.

Once the Court has affirmatively answered the first inquiry into whether a detention hearing is warranted, the Court must then hold a hearing and determine whether it can fashion conditions to assure the safety of the community or the defendant's appearance as required. 18 U.S.C. § 3142(f). Whatever the basis for detention, the Bail Reform Act's plain language does not limit the Court's consideration of the appropriate factors under § 3142(g). To the contrary, § 3142(g) directs that judges "shall" consider the "available information concerning" the enumerated factors.

Section 3142(g)'s mandatory language, moreover, articulates no link between the rationale for a detention hearing under either §§ 3142(e) or 3142(f) and the factors a court considers under §3142(g). Instead, once "a hearing is appropriate, the judicial officer *must* consider several enumerated factors to determine" whether detention or release is appropriate. *Singleton*, 182 F.3d at 9; *see United States v. Holmes,* 438 F.Supp.2d 1340, 1341 (S.D. Fla. 2005) (reasoning that, under *Singleton*, a court "should evaluate all the factors in subsection (g) when making its detention determination . . . regardless of whether detention is sought under [§ 3142] (f)(1) or (f)(2)"); *accord United States v. Plata Hernandez,* 766 Fed. Appx. 651, 656 (10th Cir. 2019) ("The plain language

---

[7] Taranto's recent history demonstrates his ability to adapt to living arrangements that obscure his location and provide him with the ability to hide from law enforcement.  Even if Taranto returned to residing at a fixed address, he has already demonstrated a willingness to abandon such accommodations for others that preclude detection of his whereabouts.  Thus, he presents a risk of flight that is serious and much greater than the risk for other misdemeanor defendants in January 6 cases.

of §3142(f) pertains to what triggers the requirement that a detention hearing be held, not the factors that guide the detention decision. Those factors are listed in § 3142(g), which contains no language limiting the consideration of those factors to hearings held only under subsection (f)(1), not subsection (f)(2).").

Judge Nichols recently came to the same conclusion in a Capitol riot case, finding that a detention hearing was appropriate under § 3142(f)(2) and considering the full range of 3142(g) factors, including the danger presented by the defendant to the community if he were released. *See United States v. Curzio*, 21-cr-41 (Minute Order dated Mar. 9, 2021). Judge Nichols ultimately ordered that the defendant remain in custody pending trial. *Id.* (Minute Order dated April 21, 2021).

Following the government's interpretation also follows settled law involving statutory construction. "In construing a statute, courts look first for the plain meaning of the text. If the language of the statute has a plain and unambiguous meaning, the court's inquiry ends so long as the resulting statutory scheme is coherent and consistent. Whether statutory language is plain depends on the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *United States v. Barnes*, 295 F.3d 1354, 1356 (D.C. Cir 2002). The word "shall" in "The judicial officer *shall*, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account [the four enumerated factors]" is a command. § 3142(g)(emphasis added). Had Congress intended to write out the dangerousness factor at a detention hearing triggered by risk of flight, it would have written it out of both § 3142(g)(4) as well as § 3142(e). Not only does holding otherwise violate the plain text of § 3142(g), it would also defeat the purpose of the individualized hearing and would defeat Congress's statutory scheme

intended to address the impact of both absconding from court appearances as well as committing crimes on release.

### III.     The § 3142(g) Factors Favor Detention.

There are four statutory factors under Section 3142(g) that the Court analyzes in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g). A review and understanding of the facts and circumstances in this case require the Court to conclude that there are no conditions or combination of conditions that would reasonably assure Taranto's future appearance and assure the safety of the community. *See* 18 U.S.C. § 3142(e)(1).

The government's burden of proof with regard to any claim of risk of flight is only by a preponderance of the evidence, *United States v. Simpkins,* 826 F.2d 94, 96 (D.C. Cir. 1987), while the government must establish by clear and convincing evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988).  A defendant's detention based on dangerousness "accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety." *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021).

In addition, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the

government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986). *See also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues. *See Smith*, 79 F.3d at 1210, *see Williams*, 798 F. Supp. at 36.

## I.   Nature and Circumstances of the Offense

At this time, Taranto is charged with four misdemeanor offenses related to the attack on the United States Capitol building on January 6.  During the siege, multiple law enforcement officers were assaulted by an enormous mob, which included numerous individuals armed with weapons, bulletproof vests, and pepper spray who were targeting the officers protecting the Capitol. Additionally, the violent crowd encouraged others in the crowd to work together to overwhelm law enforcement and gain unlawful entry into the U.S. Capitol.  When considering the nature and circumstances of the January 6 attack specifically, "several offense characteristics have emerged as guideposts in assessing, under § 3142(g)(1), the comparative culpability of a given defendant in relation to his fellow rioters."  *United States v. Chrestman*, 525 F.Supp.3d 14, 26 (D.D.C. 2021).  The listed considerations in *Chrestman* include (1) whether the defendant has been charged with felony or misdemeanor offenses; (2) the extent of the defendant's prior planning, "for example, by obtaining weapons or tactical gear"; (3) whether the defendant used or carried a dangerous weapon; (4) evidence of coordination with other protestors before, during, or after the riot; (5) whether the defendant played a leadership role in the events of January 6, 2021; and (6) the defendant's "words and movements during the riot"—e.g., whether the defendant "remained only on the grounds surrounding the Capitol" or stormed into the Capitol interior, or whether the defendant "injured, attempted to injure, or threatened to injure others."  *Id.* at 26-27.

Taranto is currently charged with four misdemeanor offenses.  He entered the Capitol building on January 6 carrying a black cane with a pointed handle.  The cane has not been recovered, and was not present in Taranto's van when it was searched.  Based on the absence of the cane, it does not appear that Taranto uses it for mobility purposes.  Taranto intended for his presence to be part of the attack on January 6.  He says as much in the video which he twice posted on social media indicating he was 'stormin' the Capitol.'

Although Taranto is currently charged with misdemeanors, nothing requires this Court to assess those charges in a vacuum.  With respect to the current charges against Taranto, the conduct alleged against him took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the certification of the Electoral College vote.  The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy."  *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 579 F.Supp.3d 1, 8 (D.D.C. 2021).

Moreover, Taranto differs from other misdemeanor defendants charged for participating in the January 6, 2021 attack on the Capitol.  Taranto has continued to act on the same motivations that caused him to breach the Capitol by communicating threats to law makers who oppose his views.  He has attempted to express those threats by breaching an elementary school where he projected footage of the January 6 attack because of his impression that such conduct would convey "shockwaves" to a member of Congress who resided nearby, doing so because of his belief that the Congressman "hated" Capitol riot participants.  He publicly declared his intention to detonate his van at a federal facility.  He has broadcast threats against the Speaker of the House,

declaring that he was "coming at" the Speaker who would not be able to "stop what's coming." He attempted to breach yet another restricted area where persons protected by the Secret Service were located.  Unlike many other January 6 misdemeanor defendants, Taranto, acting on the same impulses that drove his actions on January 6, 2021, has continued to pursue the objectives of the riot while making numerous and varied threats at the same time he possessed firearms, hundreds of rounds of ammunition, and a machete.  Unlike many other misdemeanor defendants, Taranto left his family and a stable residence to act on his impulses, chose to live without a home or fixed address, could not be located by law enforcement, and attempted to flee from Secret Service personnel.

Accordingly, the nature and circumstances of the charged offenses, coupled with evidence that Taranto has not abandoned the objectives of those offenses while pursuing those same objectives with threats of violence to the present day, weigh in favor of detention.

## II.   Weight of the Evidence

The weight of the evidence is overwhelming.  Taranto took a video of himself inside the Capitol on January 6, twice posted it to the internet, and stated he was "stormin' the Capitol."  He appears extensively on both surveillance footage from the building, body worn camera from officers, and opensource videos recorded by rioters present that day.  Independent witnesses familiar with Taranto have likewise identified him in the video footage.  Additionally, Taranto has made numerous statements about his involvement, including an hours-long interview where he discussed his presence inside the Capitol that day, pointed himself out on video at the Speaker's Lobby, and endorsed conspiracy theories regarding the shooting of Ashli Babbitt. Taranto's *pro se* filings in a civil suit contain further admissions of his presence during the riot at the Capitol on January 6. The weight of the evidence factor heavily favors detention.

### III.   The Defendant's History and Characteristics

While Taranto does not have a criminal history, his history and characteristics, most particularly his recent behavior, are highly concerning and weigh in favor of detention as they indicate that Taranto is both a high risk of flight and is a danger to the community.

Approximately two months ago, Taranto left his home in the State of Washington, drove his van cross-country to Washington D.C. and since that time appears to have lived out of the vehicle in and around the D.C. metro area.  Taranto is a former member of the military and claims to have a degree in engineering; however, he has stated on his videos that he does not have a job because he does not use Zoom.  Despite strenuous efforts by law enforcement, Taranto was not located until Secret Service encountered him near a restricted area and when they attempted to detain him, Taranto fled.

Taranto has strongly indicated his anti-government stance and has openly stated that he does not acknowledge the legitimacy of the United States Constitution or the Constitution of the State of Washington, despite repeatedly invoking the "First Amendment" and "free speech" to justify his conduct.   Nothing in Taranto's actions or his statements since January 6 have demonstrated in any way that he would recognize this Court's authority.  He appears to have little regard for the law and appears to operate under his own understanding of what the law should be. There is no indication that if given rules or directives by a United States District Court that he would comply; he did not even comply with posted directives to keep his cellular phone turned off during a sentencing hearing.

Taranto appears to express delusional beliefs which are inconsistent with reality.  Even if he claims he will follow the most stringent rules of pretrial release, there is still a large amount of responsibility that rests on Taranto's shoulders to actually comply when released into the

community.  Given the depth of his anti-government beliefs, and his broadcasted threats against political figures and government property, it is difficult to imagine that he will be capable of compliance with conditions to secure community safety and ensure his appearance before this Court.

Moreover, Taranto has familiarity with and access to weapons.  His vehicle contained two firearms and hundreds of rounds of compatible ammunition. Based on his history of firearm purchases, Taranto has access to multiple additional guns.

Lastly, there is a high likelihood that Taranto is collaborating with other people to delete or destroy evidence.  Since his arrest, at least two of his social media accounts appear to have either deleted information or been deleted entirely.  It is unknown at this time who is deleting these accounts, but there is a concern that if released, Taranto will continue to attempt to destroy evidence.

## IV.    Nature and Seriousness of Danger to the Community

If released, Taranto poses a serious risk of danger to the community.  He has clearly demonstrated his dangerousness though his increasingly erratic and disturbing words and actions. Over the course of two weeks, Taranto: (1) entered an elementary school where he trespassed for hours to attempt to directly intimidate a sitting congressman that he believed lived nearby; (2) claimed to have a self-driving vehicle capable of blowing up the National Institute of Standards and Technology; (3) published a call which he made to the Speaker of the House's staff and then made threatening statements about the Speaker; (4) attempted, in a restricted area, to find entrance points and tunnels underneath the private residences of political figures protected by the Secret Service; (5) possessed weapons and hundreds of rounds of ammunition in and around a restricted residential neighborhood; and (6) fled from United States Secret Service personnel as they were

trying to take him into custody.

Taranto is a direct and serious threat to the public.  Taranto's own words and actions demonstrate that he is a direct threat to multiple political figures as well as the public at large.  The risk that Taranto poses if released is high, and the severity of the consequences that could result are catastrophic.

Taranto was broadcasting his threats and acting to further them when law enforcement could not establish his specific location.  Accordingly, the danger that Taranto presents is not unrelated to the risk that he will flee if released from custody.  The United States is continuing to assess the materials recovered from its searches of Taranto's vehicle and his devices, but anticipates seeking further charges arising at least from the defendant's possession of firearms.  Whether charged or not, the Taranto's recent conduct provides convincing and obvious grounds for the United States to seek a more severe sentence in the event of his conviction.  Such potential exposure provides additional reason why he may choose to flee and conceal his whereabouts.  The community should not have to confront the risk that he will again make such a choice or confront the consequences of his conduct if he does.

**CONCLUSION**

The government respectfully requests that the Court issue an Order granting its motion that the defendant be held without bond pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:    /s/ *Allison K. Ethen*
Allison K. Ethen
MN Bar No. 0395353
Colin Cloherty
D.C. Bar No. 1048977
Assistant United States Attorneys
601 D Street NW, Fifth Floor
Washington, D.C. 20530
E-mail: Allison.ethen@usdoj.gov
Telephone: (612) 664-5575

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel this 5th day of July 2023.

      /s/Allison K. Ethen
Allison K. Ethen
Assistant United States Attorney