# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | No. 23-000150-M |
| ) | |
| TAYLOR TARANTO ) | |
| ) | |
| **Defendant** ) | |
| ) | |

## SUPPLEMENT IN SUPPORT OF MOTION FOR PRETRIAL RELEASE

Mr. Taylor Taranto, through his undersigned counsel, respectfully submits this supplemental memorandum in support of his Motion for Pretrial Release. Mr. Taranto does not pose a serious flight risk. He was honorably discharged from the Navy, has no criminal record, extensive family support, and actively engages with established medical and mental health providers through the Department of Veterans Affairs located in Washington state. Because the government has not met its burden to demonstrate that Mr. Taranto is a serious flight risk, Mr. Taranto must be released home to his family in Washington state, with conditions to continue with mental health treatment and access additional treatment through the Department of Veterans Affairs as needed.

Mr. Taranto has now been charged with misdemeanor offenses that he allegedly committed *two and a half years* ago. The government's actions belie the hyperbolic assertions that he is both a serious flight risk and/or dangerous. In addition, the information proffered by the prosecution reveals mischaracterized and misconstrued facts about both the incident and Mr. Taranto's history and characteristics. In short, fair application of the Bail Reform Act weighs overwhelmingly in the favor of release.

  I.  **Taylor Taranto's History and Characteristics Weigh Heavily in Support of Release.**

Taylor Taranto is a loving father, husband, and veteran of the U.S. military. He has lived in Washington state his entire life, except for his years of honorable service in the United States Navy. Mr. Taranto enlisted in the Navy in August of 2004. During his time in the Navy, he specialized in cryptologic technology, worked in naval construction, and was deployed to Iraq, where he drove in combat convoys. After serving for six years, Mr. Taranto was honorably discharged. His sacrifice to this country came with severe consequences as he returned to civilian life with significant trauma. Since that time, Mr. Taranto has worked diligently with Department of Veterans Affairs mental health professionals to overcome the substantial trauma that he suffered from his deployment.

Mr. Taranto is a beloved father and husband with strong family support network in Washington. Mr. Taranto owns a home in Washington with his wife of 15 years. His mother, father, sibling, and many other members of his family reside in Washington State. Ms. Taranto's wife has attended court proceedings in the District demonstrating her commitment to her husband. His family misses him dearly and stands ready to support him back home.

II.  **Despite Allegations of Fugitive Status, Law Enforcement Knew or Should Have Known the Location of Mr. Taranto for Years, and Declined to Act.**

The government has repeatedly suggested that Mr. Taranto was a fugitive and describe "frustrating" efforts to locate him. But it was the government's decision not to arrest Mr. Taranto sooner for offenses relating to January 6, 2021, and this choice undermines the prosecution's newfound contention that he is both a flight risk and a danger.

Mr. Taranto has made no attempts to hide within the District – he, in fact, has made himself visible in numerous ways.  As the government has acknowledged, he has been livestreaming and posting his exact whereabouts for at least two years. He has very visibly participated in rallies and vigils in front of law enforcement and in front of the D.C. Jail.  It is

Counsel's understanding that these demonstrations, dubbed as the Freedom Corner vigil, are typically overseen by MPD officers and take place on D.C. Jail premises. Furthermore, numerous sources have reported that Mr. Taranto's van has been parked overnight across the street from the D.C. Jail on most nights since his recent arrival in the District.

The FBI and law enforcement by their own admission has been aware of Mr. Taranto's identity and participation in the Capitol events since at least August 2021. Beyond the enormous breadth of the January 6th investigation, Mr. Taranto was named as a defendant in a civil suit filed by Officer Jeffrey Smith's widow.[1] David Walls-Kaufman, Mr. Taranto's co-defendant in the lawsuit, was charged with misdemeanor offenses relating to the Capitol events in July 2022.[2]

Despite the longstanding knowledge of Mr. Taranto's alleged conduct and his whereabouts, the Government requested and this Court signed a warrant for Mr. Taranto's arrest on June 29, 2023 for conduct related to January 6, 2021. He was arrested the same day. While the precise timing of the application for the warrant is unclear to the defense, the government's manufactured urgency is unsupported by the record.[3]

Even though Mr. Taranto has been identified as connected to January 6th and Mr. Walls-Kaufman since at least August 2021, the government only recently pursued charges against Mr. Taranto. The government's actions, (i.e. actively surveilling him for this period rather than

---

[1] In that lawsuit, Mr. Taranto is not accused of touching Officer Smith in any way, nor is he charged with any related conduct here. Furthermore, Mr. Taranto is not charged with any assaultive conduct whatsoever regarding events at the Capitol.

[2] Importantly, the Government, upon reviewing the voluminous video footage, determined that they did not have sufficient evidence to charge Mr. Walls-Kaufman with assaulting an officer. See https://www.washingtonpost.com/dc-md-va/2023/06/13/capitol-rioter-lawsuit-police-suicide/; see also https://www.nbcnews.com/politics/justice-department/judge-questions-dojs-handling-jan-6-rioter-scuffled-officer-died-suici-rcna82979.

[3] When Mr. Taranto was arrested, he was unarmed and entirely compliant with law enforcement.

pursuing his arrest) demonstrate more accurately the government's assessment of his dangerousness and the risk of his flight.

### III. Mr. Taranto's Temporary Presence in D.C. Does Not Suggest He is a Serious Flight Risk.

The government wrongly argues that Mr. Taranto's presence in Washington D.C. weighs in favor of detention. Mr. Taranto came to Washington, D.C. to review footage that he hoped would prove his innocence in the civil lawsuit filed by Officer Smith's widow. He was extremely disturbed by the apparently false allegations that he contributed to a police officer's death given his own history of honorable military service. But importantly, Mr. Taranto in no way hid or concealed the fact that he was in D.C. As the Government has conceded, Mr. Taranto posted widely across his social media accounts indicating where he was, which was often *right at the D.C. Jail*. Numerous witnesses have seen Mr. Taranto at the January 6th "Freedom Corner" vigil, which gathers directly outside of the D.C. Jail and has for the past month and a half. Additionally, Mr. Taranto recently attended the sentencing hearing of his co-defendant, David Walls-Kaufman, at the D.C. federal district court, and he interacted with law enforcement agents while so doing. If law enforcement was tracking his whereabouts and concerned about a need to detain him, as they now claim, they could have easily issued a warrant sooner and located Mr. Taranto. Mr. Taranto has always made his whereabouts known.

The government also suggests that Mr. Taranto left Washington state impulsively, but Mr. Taranto had a clear and lawful goal in coming to DC: to review the tapes of January 6th that Speaker McCarthy promised to disseminate. Mr. Taranto was well within his Constitutional right to engage in interstate travel and come to Washington, D.C. Once here, Mr. Taranto did demonstrate stability. As numerous individuals can attest, Mr. Taranto frequented the same areas and had residential continuity while in D.C. He temporarily resided in his van, as many

individuals do and as he is allowed to do. Upon returning to Washington state, he will return to the stability he has long enjoyed, to live in the house he owns and has lived in with his wife of over 15 years, and with the support of the Department of Veterans Affairs for ongoing mental health treatment and care.

      **IV.    Mr. Taranto Did Not Delete or Destroy Evidence as the Government Attempts to Suggest.**

The government has repeatedly suggested that Mr. Taranto and/or his family or *someone* affiliated with him has intentionally deleted or destroyed potential evidence from his social media accounts. First, to the extent the privacy settings were changed from public to private on a given account, that is fully within an account holder's rights to do so, particularly given overwhelming media interest in this case. Furthermore, as discussed by a well-followed livestreamer who has been closely tracking the cases of January 6th, it appears that Mr. Taranto's YouTube channel was shut down by the platform itself, as potentially other accounts of his have as well.[4] Mr. Taranto has been in custody since his arrest and has had no access to any of these accounts since his arrest. Any suggestion that he has tampered with or destroyed evidence is demonstrably false.

      **V.    Mr. Taranto's Purported Statements Constitute Protected Speech and Do Not Constitute Threats, as Evidenced by the Government's Non-Pursuit of Any Threats-Related Charges.**

The government has argued that Mr. Taranto should be treated differently from other misdemeanor defendants due to what amounts to his political speech. His words are not criminal, as evidenced by the government's choice not to pursue charges relating to threats. Within context, Mr. Taranto's statements are clearly protected speech.

---

[4] See @JustALazyGamer, "Freedom Corner Used Against Taylor Taranto," YouTube, July 7, 2023, https://www.youtube.com/watch?v=U3ZeCTm8jMw (29:55).

First, Mr. Taranto, by no means whatsoever, "breached" or "trespassed" in an elementary school. Mr. Taranto apparently did attend an authorized film screening hosted by an organization called "Make America Safe Again" at Piney Branch Elementary School in Takoma Park on a weekend. Montgomery County, where Piney Branch is located, allows individuals and groups to use its public facilities. The organization, Make America Safe Again, followed the appropriate steps and submitted a request to screen a film at the school, through the Office of Community Use of Public Facilities.[5] In fact, according to Christine Oberdorf, the Principal of Piney Branch, the group followed the "established protocols and procedures for community use through that the office."[6] The request was approved, and the organization was permitted to be on the campus of Piney Branch Elementary School. The event took place, and there was no reported criminal activity. Even the Takoma Park Police Department confirmed this, as it issued a news release saying that there were no calls about burglary, trespass, or suspicious situations, and that "there is no active threat against any facility in the City or the community."[7] Moreover, Mr. Taranto did not even organize this event at an elementary school. He was only an attendee, and thus not privy to the specifics of the permission to be on the school's grounds. Mr. Taranto did not breach or trespass upon the school as alleged by the government, nor did he actually threaten Representative Raskin—as evidenced by the government's non-pursuit of any threats related charges in this case.

---

[5] Asbury, Nicole, "Man with guns near Obama home entered a Montgomery school for Jan. 6-related film, Washington Post, July 6, 2023 https://www.washingtonpost.com/education/2023/07/06/montgomery-school-taylor-taranto-jan6/. See also attached Permit at Exhibit A.
[6] Id.
[7] Id.

Regarding the Government's allegations about Speaker McCarthy, Mr. Taranto simply attempted to contact Speaker McCarthy in order to view the January 6th footage which the Speaker suggested were exculpatory, and was encouraged by the Speaker himself.[8] In February of 2023, Speaker McCarthy granted Tucker Carlson, the former primetime Fox News host, access to the security footage from January 6th. U.S. Capitol Police Chief Tom Manger confirmed this—that the Capitol Police released the footage to the Speaker who then gave access to Carlson.[9] Speaker McCarthy, in a phone interview on the matter, said, "I promised…I was asked in the press about these tapes, and I said they do belong to the American public."[10] Mr. McCarthy made public statements that suggested his belief that the tapes belong to American citizens and should be publicly released.

Furthermore, according to the *New York Times,* Speaker McCarthy has said that he intended to make the footage from January 6 even more available than before.[11] For example, in March of 2023, McCarthy expressed that he would grant other news agencies access to the tapes.[12] This has not yet happened, and several outlets are even suing for access.[13] Further

---

[8] Broadwater, Luke & Jonathan Swan, "In Sharing Video with Fox Host, McCarthy Hits Rewind on Jan. 6," *New York Times,* February 22, 2023, https://www.nytimes.com/2023/02/22/us/politics/tucker-carlson-jan-6-mccarthy.html

[9] By Grayer, Annie, Jamie Gangel, Alayna Treene & Hannah Rabinowitz, "McCarthy gives Tucker Carlson access to January 6 Capitol security footage, sources say," February 21, 2023, https://www.cnn.com/2023/02/20/politics/kevin-mccarthy-tucker-carlson-january-6 footage/index.html

[10] Broadwater, Luke & Jonathan Swan, "In Sharing Video with Fox Host, McCarthy Hits Rewind on Jan. 6," *New York Times,* February 22, 2023, https://www.nytimes.com/2023/02/22/us/politics/tucker-carlson-jan-6-mccarthy.html

[11] *Id.*

[12] Pengelly, Martin, "McCarthy: January 6 tapes to be 'slowly' rolled out at networks besides Fox News," March 12, 2023, https://www.theguardian.com/us-news/2023/mar/12/kevin-mccarthy-jan-6-footage-tucker-carlson-fox-news

[13] Polantz, Katelyn, "Media organizations sue for Capitol Hill surveillance tapes that McCarthy gave to Fox News," *CNN News,* April 12, 2023, https://www.cnn.com/2023/04/12/politics/media-organizations-sue-surveillance-tapes/index.html

demonstrating the lack of accessibility to the January 6 footage, Representative Marjorie Taylor Greene tweeted in May of 2023:

> A lot of people are asking me when we are going to release the J6 video tapes… Remember when Tucker Carlson released video footage especially about Jacob Chansley and everyone found out and couldn't deny the TRUTH that the guy did absolutely NOTHING WRONG but walk in the Capital wearing a costume and a crazy bull horned hat? And Tucker was also able to show that Brian Sicknick was not killed on J6 by protestors like ALL the Democrats and the media told you. Yes well the rest of the footage needs to be released to THE PEOPLE because it's hard to lie to people all the time when they can go look at it and form their own opinion…We need to release the J6 tapes to a public on line source so that everyone knows what did and didn't happen, we need to restore fair justice, and American can move on.[14]

With public figures, like Representative Greene, calling for the release of footage, Mr. Taranto was merely following up on this perceived right, in hopes that the footage, which he had yet to view himself, would exonerate him for alleged actions associated with Officer Jeffrey Smith and his death.

While the government alleges that Mr. Taranto threatened Speaker McCarthy, his language far from qualifies as an imminent threat or advocacy of violence. *See Brandenburg v. Ohio*, 395 U.S. 444 (1969). Mr. Taranto's speech, rather, is more properly classified as political hyperbole, in which he has attempted to bring attention to issues pertaining to the events of January 6th and conspiracy theories surrounding the same. *See e.g. Watts v. United States*, 394 U.S. 705 (1969) (Petitioner's remark at small public gathering that, if inducted into Army and "[made] to carry a rifle, the first man I want to get in my sights is L.B.J.," held to be crude political hyperbole which, in light of its context, did not constitute a knowing and willful threat against the President within the coverage of 18 U.S.C. § 871(a)).

---

[14] Marjorie Taylor Greene (@mtgreenee), Twitter (May 7, 2023), https://twitter.com/mtgreenee/status/1655318430935916551?s=20.

The government also alleges that Taranto was trying to trespass on private or restricted property when he was apprehended near the reported residence of Former President Obama and Former White House Chief of Staff John Podesta—whose address had reportedly been shared publicly on TruthSocial by Former President Trump.[15] Yet, Mr. Taranto was not trying to go on or into private residences, was unarmed, and upon information and belief was at no time on restricted property –as evidenced by the fact that the Government has not brought any charges for trespass related to this event either. Instead, Mr. Taranto referenced in a tongue-in-cheek manner the possibility of there being tunnels, a reference to QAnon theories that there are tunnels beneath Washington, D.C. connected to homes of notable politicians involving child trafficking rings.[16] Noticeably, there is no language about bursting down doors and breaking into widows. Mr. Taranto's livestream focuses on the possibility of tunnels existing, *not* on entering the domiciles of Former President Obama and John Podesta.

Additionally, Mr. Taranto's citations to the "First Amendment" or "free speech" also furthers an understanding of Mr. Taranto's intent. The government suggests that Mr. Taranto thought his invocation of the First Amendment "absolved him from any trespass." This is incorrect. Rather, the First Amendment protects Mr. Taranto's discussion and critique of his political subjects, even of the President of the United States. *See Watts v. United States*, 394 U.S. 705 (1969). The First Amendment also allows for Mr. Taranto to livestream and expose subjects in public places. When referencing getting "the shot" or "an angle," Mr. Taranto is simply

---

[15] *See e.g.*, Aaron Blake, *Yes, Trump is getting more reckless on social media*, The Washington Post (July 6, 2023), https://www.washingtonpost.com/politics/2023/07/06/trump-truth-social-obama/.
[16] *See* Ali Breland, *Why Are Right-Wing Conspiracies so Obsessed With Pedophilia?*, Mother Jones (July/August 2019), https://www.motherjones.com/politics/2019/07/why-are-right-wing-conspiracies-so-obsessed-with-pedophilia/.

referring to livestreaming, videotaping, and photography. This is particularly clear when he says, "[j]ust trying to get an angle, for First Amendment, free speech," as quoted in the government's detention memorandum.

Mr. Taranto's language is protected, and there is no tangible threat present. Moreover, if the government thought there was a credible threat, particularly against former President Obama, then they would have brought charges relating to the same. The government has not done so because Mr. Taranto's language is protected First Amendment speech and his actions do not carry criminal liability.

Regarding the livestream video supposedly filmed near the NIST building, it is important to point out that Government Counsel has not actually reviewed the video nor have they been able to retrieve it. It is Counsel's understanding from Government Counsel that the video was apparently viewed at the time of its livestream by a law enforcement agent surveilling Mr. Taranto, who supposedly took notes. That agent's notes have in turn been translated into the Government's selective representations about alleged content in that video, which cannot be confirmed. Given the great number of representations by law enforcement in this case that have at this point been contradicted, Counsel simply does not believe the Court should credit the Government's selective recounting of the NIST video's purported contents.

Lastly, the government points to Mr. Taranto's usage of social media as evidence that he is engaging in conduct like that surrounding January 6th. As he is permitted and empowered to do so under the First Amendment, Mr. Taranto has shared his thoughts and opinions publicly on an array of topics, some of which is clear hyperbole. Though the government may not recognize or agree with what Mr. Taranto has posted, he is well within his Constitutional rights to critique authority, and investigate and call attention to so-called "conspiracy theories." See e.g., *New*

*York Times Co. v. Sullivan*, 376 U.S. 254 (1964). His actions are protected First Amendment activity, he is not a danger, and he simply should not be detained.

**VI.     Conclusion**

Mr. Taranto, an honorably discharged veteran, has no criminal history and is now charged with four misdemeanor offenses related to the events on January 6, 2021 two and a half years after the fact. The fact that law enforcement waited over two years and a half years, despite surveilling Mr. Taranto throughout that time, as well as the Government's non-filing of any threats related charges regarding recent alleged incidents, indicates that the Government's concerns over dangerousness are unfounded. Mr. Taranto is not a flight risk nor a danger, and for the foregoing reasons, Mr. Taranto respectfully requests that this Court release him so he can return home to Washington state.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Kathryn D'Adamo Guevara
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500